**FILED**

APR 2 8 2010

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| APPLICATION OF CARATUBE | ) | Case: 1:10-mc-00285 |
| INTERNATIONAL OIL COMPANY, | ) | Assigned To : Bates, John D. |
| 92A Polezhaeva St., | ) | Assign. Date : 4/28/2010 |
| Zhetysusskiy Region Almaty, 050050 | ) | Description: Miscellaneous |
| Republic of Kazakhstan | ) | |
| | ) | |
| Applicant. | ) | |
| | ) | |

### PETITION OF CARATUBE INTERNATIONAL OIL COMPANY FOR DISCOVERY
### IN AID OF A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C § 1782

Applicant Caratube International Oil Company, LLP ("Caratube" or "Applicant") hereby

petitions this Court for assistance in obtaining discovery in aid of a foreign proceeding pursuant

to 28 U.S.C. § 1782. On June 16, 2008, Caratube initiated an international arbitration against the

Republic of Kazakhstan before a foreign tribunal for losses resulting from Kazakhstan's

politically motivated breach of a license agreement to develop oil fields in an oil rich area of

Kazakhstan. Section 1782 empowers United States district courts with authority to compel

discovery: (i) from companies and persons found within this district; (ii) for use in proceedings

before a foreign or international tribunal; and (iii) upon the application of an interested party. 28

U.S.C. § 1782. Under this statute, Caratube seeks documents from entities known to be assisting

and having assisted Kazakhstan with political and other efforts in the United States and

elsewhere. The person and entities from which Caratube seeks documents are: Alexander

Mirtchev, Krull Corporation, GlobalOptions Inc., BGR Group, and Policy Impact



Communications ("PIC").[1]  Caratube seeks, among other things, documents that relate to any investigation, monitoring, surveillance, analysis, reporting, discussions or advocacy concerning Caratube, its officers and employees, Caratube's owner, Devincci Hourani, and his family, including his brother Issam Hourani (also spelled "Khorani").  These documents are essential to the international arbitration proceeding because they evidence Kazakhstan's politically motivated efforts to destroy Caratube and its related entities for no reason other than a naked political power grab.  Indeed, Kazakhstan's termination of Caratube's license agreement has cost the company tens of millions of dollars.

Because we believe some or all of the entities from whom we seek documents had some knowledge, involvement, or role in Kazakhstan's actions as to the applicant, its principal owner and his family, Caratube requests an order permitting it to serve the proposed subpoenas on Alexander Mirtchev, Krull Corporation, GlobalOptions Inc., BGR Group, and PIC, each of which is found in the District of Columbia.  *See* Exhibits 1 through 5.  The application for discovery is intended to seek and recover documents in control of these individuals and entities not only present in Washington, D.C., but also in their other offices or locations, either in the United States or other countries.  We also request the Court to issue an instruction to the recipients of its Order that they are to preserve and not destroy any "documents," as that term is defined in the proposed discovery requests, or any other materials that might be responsive to Caratube's discovery requests.

## BACKGROUND

Since June 16, 2008, Caratube has been engaged in an international arbitration proceeding against the Republic of Kazakhstan before a foreign tribunal at the International

---

[1]     Also sometimes referred to as Policy Impact Strategic Communications.

Centre For Settlement of Investment Disputes ("ICSID," "ICSID Tribunal" or "Tribunal"). A true and correct copy of the Request for Arbitration is attached hereto as Exhibit 6. Caratube is incorporated in the Republic of Kazakhstan and is 92% owned by Devincci Salah Hourani, a United States citizen domiciled in the Commonwealth of Virginia. In the ICSID proceeding, Caratube alleges breach of contract and other claims under international law, including expropriation, and seeks compensation arising out of the loss of its long-term and substantial investment in the exploration and development of certain oil fields in an oil rich area of Kazakhstan. Caratube had an exclusive license to develop these oil fields pursuant to a contract executed in 2002. The license was terminated in mid-2007, however, by Kazakhstan in violation of both the contract and the applicable bilateral investment treaty – The Treaty between the United States of America and the Republic of Kazakhstan Concerning the Encouragement and Reciprocal Protection of Investment, U.S.-Kazakhstan, May 19, 1992, S. TREATY NO. 103-12 (1993) ("BIT"). As a consequence, Caratube filed the pending arbitration proceeding in ICSID.

Although Kazakhstan asserts in the ICSID proceeding that the bases for the termination of the contract with Caratube included alleged breach of contract and alleged non-performance by Caratube, in reality the contract was terminated as part of the fall-out of a nasty family political fight within Kazakhstan. Nursultan Nazarbayev has been the President of Kazakhstan since 1989, when the country was formed during and following the break-up of the Soviet Union. Rakhat Aliyev was Nazarbayev's son-in-law, as he was married to Nazarbayev's daughter Dariga. Following Nazarbayev's re-election to a seven year term as President in 2005, Nazarbayev proposed that Kazakhstan's constitution be amended so that he could run for election again in 2012, and serve for life. Without such amendment, Nazarbayev was term-limited and would have to leave office. In 2007, Aliyev, who was then serving as Kazakhstan's

3

Ambassador to Austria, publicly opposed Nazarbayev's efforts and indicated he was interested in running for President in 2012.

In retaliation for Aliyev's actions, Nazarbayev: (1) had his daughter's marriage to Aliyev dissolved; (2) had arrest warrants issued for Aliyev and succeeded initially in having Aliyev arrested in Vienna; (3) had a criminal prosecution instituted against Aliyev in Kazakhstan; (4) had Aliyev tried and sentenced for various crimes *in absentia*; and (5) sought the extradition of Aliyev from Austria. The Government of Austria, however, refused to extradite Aliyev and he remains to this day in Vienna. As additional retaliation for Aliyev's actions, the Nazarbayev regime sought out and punished anyone related to Aliyev, however remotely. This is where Caratube is relevant. Aliyev's sister is married to Issam Hourani (also spelled Khorani). Issam Hourani is the brother of Devincci Hourani, the 92% owner of Caratube.

As described in detail in the memorials filed before ICSID, from September 2007, the relationship between Caratube and the Republic of Kazakhstan deteriorated in direct correlation with the rise of political tensions between Nazarbayev and Aliyev. From the summer of 2007, the Republic of Kazakhstan has conducted a series of intrusive and burdensome investigations into the affairs of Caratube, which have impeded its ability to operate. The Kazakhstan Ministry of Internal Affairs has intimidated and threatened Devincci Salah Hourani and his family by raiding his offices and homes in Kazakhstan, and taking him into custody in the middle of the night to question him about false accusations. Kazakhstan interrogated Caratube employees regarding ties between Caratube's owners and Aliyev, and issued bribes to induce the spread of false accusations of criminal conduct about members of the Hourani family and others associated with them. Beyond that, agents of Kazakhstan have engaged in a public relations campaign to defame Aliyev and members of the Hourani family.

### Parties From Whom Discovery Is Sought

Kazakhstan has been actively aided in its efforts to harass Caratube and the Hourani family by certain entities and individuals in the United States and abroad. As we detail below, Caratube seeks discovery under §1782 from Dr. Alexander Mirtchev, Krull Corporation and its affiliate Krull Corp. UK ("Krull"), GlobalOptions Inc. and its affiliate GlobalOptions Management, Inc. ("GlobalOptions"), the lobbying firm BGR Group, and the lobbying firm PIC.

One person who is particularly at the center of Kazakhstan's efforts to undermine Caratube, Aliyev, and members of the Hourani family is Dr. Alexander Mirtchev. He is described on the website www.Krullcorp.com as "the founder and president of Krull Corp., a global strategic solutions provider." *See* Exhibit 7. That same page identifies Mirtchev as the "Independent Director of the Board for Kazakhstan's sovereign wealth fund." *Id.* Elsewhere on the Krull website, on the link "In the News," is a series of news releases and video links that extol Mirtchev's expertise in global economic issues. Among these articles is an article dated November 28, 2008, entitled "Kazakh Stabilization Plan Starts to Take Shape." The short summary of that article describes Mirtchev as "an economic advisor to Kazakhstan's prime minister." *See* Exhibit 8. The link on the website to the article in *Euroweek,* provides another short summary that describes Mirtchev as "director and member of the board of Kazyna-Samruk," a multi-billion dollar fund established in Kazakhstan to help the Kazakhstan government deal with the global economic crisis. *Id.*

In a *Wall Street Journal* article published on July 23, 2008, Mirtchev is described by Aliyev "as the point man for President Nazarbayev, not only in seeking to resolve his legal problems but in helping to manage some of the fortune that he has accumulated in 19 years in power." *See* Exhibit 9. The article goes on to explain that Mirtchev is both a political and

financial advisor to the Nazarbayev family and that he has assisted the family in secretly moving

hundreds of millions of dollars into various hidden accounts by way of Krull UK. *Id.* Paper

Trail links identified in the article include a 2003 resume of Mirtchev, which identifies him as,

among other things, the Chairman of the Board of Krull Corporation Limited (UK) and

Chairman of the Board of GlobalOptions Management, Incorporated. *Id.* Also linked is an

unsigned service contract between Krull Corp. UK and Kazakhstan for industrial, trade and

consulting services, as well as a bank statement that documents a $1 million payment from a firm

in Lebanon to a bank in London for the benefit of Krull Corp. UK, doing business for the

Nazarbayevs. *Id.*

Various Mirtchev business cards reveal his connections to different companies.  He

identifies himself as the Chairman and CEO of Krull Corporation headquartered in Washington,

D.C., as well as the Chairman of GlobalOptions Management, Inc., which is a joint venture of

Krull and GlobalOptions Group, and also based in Washington, D.C. at 1615 L Street, N.W.  *See*

Exhibit 10.  He has an additional business card for his role as Chairman of GlobalOptions

Management, Inc.'s London branch, which has on it an address "c/o Krull Corporation (UK)

Ltd." *Id.*  The address listed at "150 Minories" in London is the same address as that listed for

"Krull European Headquarters" on a separate business card.  *Id.*  Krull Corporation itself states

on its website that it is "[b]ased in Washington, D.C." and that it "provides strategic solutions,

counsel and project management to select clients – with a focus on new economic trends and

emerging policy changes."  *See* Exhibit 11.

Likewise GlobalOptions Inc. is based in Washington, D.C., and is a subsidiary of

GlobalOptions Group, Inc. in New York.  *See* Exhibit 12.  The attached Dunn and Bradstreet

Report reflects that GlobalOptions Inc., which is currently located at 1501 M Street, N.W., was

previously located at 1615 L Street, N.W., the same address listed on Mirtchev's business card

for GlobalOptions Management, Inc.  GlobalOptions has also long been associated with doing

work for the Government of Kazakhstan, and in particular with the Nazarbayev family.  One

prime example is reflected in a May 12, 2008 article in the *Wall Street Journal* entitled "Kazakh

Leader's Daughter Monitored U.S. Bribe Case." *See* Exhibit 13.  The article reveals that in

connection with the well-publicized criminal prosecution of New York banker James Giffen for

allegedly accepting bribes from U.S. companies to gain access to the Kazakhstan oil market,

Nazarbayev's daughter Dariga (Aliyev's ex-wife) hired GlobalOptions to monitor the bribery

case and provide her and her family with regular detailed reports about the events in the New

York prosecution. *Id.*

     In sum, it is clear that Mirtchev, Krull, and GlobalOptions each regularly do business at

the behest of the Government of Kazakhstan, and more particularly for the Nazarbayev family.

It is likewise clear that there is an ongoing effort to defame Aliyev and the Hourani family.

Kazakhstan has targeted Rakhat Aliyev not only because he directly challenged Nazarbayev's

political power by opposing his stronghold on the presidency, but also because in 2009, Aliyev

wrote and published a book entitled "Godfather-in-Law" in which he lays bare many of the

failings of President Nazarbayev, his family, and cohorts, including Mirtchev and others.  This

has further fueled the behind-the-scenes smear campaign by Kazakhstan and its agents against

the Hourani family.

     For example, at about the time that Aliyev's book was published, an entity in Bonn,

Germany calling itself the Eurasian Transition Group ("ETG") published a report entitled, "The

Aliyev Dossier." *See* Exhibit 14.  Apart from focusing largely on Aliyev's alleged

transgressions, the Dossier states that "Aliyev's sister Gulzhat is married to the Lebanese citizen

Khorani, son of one of the most influencial [sic] individuals in the Lebanon [sic] and in the

Palestine region." *Id.* at 8.  The Dossier then declares that there is evidence "Khorani" imported

workers into Kazakhstan with "direct links to terrorism movements, some of them with Al

Qaida." *Id.*  It goes on to assert that the Hourani family has "close links to Hizbollah, even

finances the organization." *Id.* at 9.  Still further, the Report asserts that an anchor woman for

Kazakh television allegedly fell to her death from a balcony of a house allegedly owned by the

Hourani family. *Id.* at 11.  None of this is true except that Issam Hourani is in fact married to

Aliyev's sister.

Following the publication of the Dossier, someone from ETG e-mailed a message to

Mirtchev and Krull on July 15, 2009 (at the e-mail addresses krull_ceo@attglobal.net and

KrullEurope@aol.com – the same addresses as on Mirtchev's business cards), stating: "After the

publication of R. Aliyev's book and recent tensions in Austria and Western Europe regarding the

whole case, ETG decided to publish a dossier on R. Aliyev, Issam and Devinchi [sic] Horani

[sic].  It covers his connection with drug traffic, illegal weapons import, Islamic terrorists, and

the responsibility of Western authorities." *See* Exhibit 15.  Clearly there is a connection between

the Government of Kazakhstan, the Dossier, and Mirtchev/Krull.

The Government of Kazakhstan is clearly interested in perpetuating such falsehoods

directed at the Hourani family.  Indeed, on the website of the Embassy of Kazakhstan to the

United States, there is an official press release dated December 18, 2008, listed as News Bulletin

31 and entitled "The Former Kazakh FBI Apprentice From Jack the Ripper To a Democrat."

http://www.kazakhembus.com/index.php?mact=News,cntnt01,detail,0&cntnt01articleid=161&c

ntnt01returnid=90. *See* Exhibit 16.  Again, while the thrust of the material is an attack on

Aliyev, the press release asserts about three-quarters of the way through that Issam Hourani is

married to Aliyev's sister and that he supposedly has ties to terrorist groups such as Al Qaida and Hizbollah, among others. The press release then asserts with some amazement that "[f]or unclear reasons these facts and evidences have been ignored both in Austria and in Great Britain." *Id.*

BGR Group, a Washington D.C.-based lobbying firm, with an office in London, is also doing significant work for Kazakhstan. The attached Registration Statement made pursuant to the Foreign Agents Registration Act, and filed with the U.S. Department of Justice, reveals that since January 22, 2010, BGR Public Relations, an entity within BGR Group, has been a registered foreign agent for the Government of Kazakhstan and, to our knowledge, has engaged in significant public relations and other activities on behalf of that Government and in an effort to further the goals of the Nazarbayev family. *See* Exhibit 17. Indeed, an undated and unsigned memorandum entitled "Meeting with Barbour, Griffith & Rogers (BGR)," explains that BGR is willing to undertake a representation of Kazakhstan, but only on a long-term and comprehensive basis and after being provided with updates on various issues, including "an update of" an unidentified "legal court case." *See* Exhibit 18.

By way of background, the BGR Group, according to its website, was founded in 1991 by Haley Barbour, currently the Governor of Mississippi, Lanny Griffith and Ed Rogers, who had then recently left a position in the White House working for President George H.W. Bush. *See* http://www.bgrdc.com/about-history.html. *See* Exhibit 19. PIC, another lobbying group in Washington, was founded in 1997, according to its website, by Haley Barbour and Ed Gillespie, both former Chairmen of the Republican National Committee. The site goes on to explain that PIC's "Board of Directors included Lanny Griffith and Ed Rogers, two of Washington, D.C.'s most powerful lobbyists and partners in the firm Barbour Griffith & Rogers." *See* Policy Impact

Communications, http://www.policyimpact.com/index.php/about (last visited April 27, 2010),

Exhibit 20.  Like BGR, PIC is also doing substantial public work for Kazakhstan.  For example,

a recent article published on April 15, 2010 on the website www.mainjustice.com about the long-

running Giffen prosecution and entitled "SDNY Shakes Up Team on Long-Stalled Kazakh Bribe

Case," notes that "[b]ehind the scenes, the Kazakh government is also working to improve its

image in the U.S."  Indeed, bus stops throughout Washington, D.C. currently have ads "touting

Nazarbayev and Kazakhstan."  *See* Exhibit 21.  Moreover, the article notes that Kazakhstan last

summer "signed a $1.5 million lobbying contract with [PIC]" to, among other things, "place op-

ed pieces in 'prestige' media" and "monitor 'writers known to be critical' of the country."  *Id.*

Indeed, PIC's website lists the Embassy of Kazakhstan as one of its clients, and among

the items PIC proposed as "Key Deliverable[s]" for PIC to achieve during the first year of its

work for Kazakhstan were: (1) conduct an audit "of Kazakhstan's presence on the global

Internet;" (2) improve or establish a new website for Kazakhstan in the U.S.; and (3) create "a

legitimate blogger and build the content, reputation, and influence of a pro-Kazakhstan site."

*See* "PIC Agenda, Objectives and Deliverables May 1, 2009 – May 1, 2010."  Exhibit 22 at 13.

Additional public filings by William Nixon and Yerbol Bekmyrza, both of whom work at PIC,

explain that their duties for Kazakhstan under the PIC contract, include "refining or establishing"

a website for Kazakhstan, and "establishing an official Kazakhstan blog."  *See* Exhibits 23 and

24.

In light of the foregoing, and in light of the claims asserted in the ICSID arbitration,

Caratube has filed this application pursuant to 28 U.S.C. § 1782, to obtain discovery from

Alexander Mirtchev, his companies, GlobalOptions and Krull, the BGR Group, and PIC.  Each

has done or is doing various acts on behalf of the Republic of Kazakhstan and the Nazarbayev

family that directly impact Caratube and members of the Hourani family, and that this information, when obtained through discovery, will aid the resolution of the ongoing foreign arbitration proceeding.

## 28 U.S.C. § 1782 AUTHORIZES THIS COURT TO COMPEL THE PRODUCTION OF DOCUMENTS

Section 1782 of U.S. Code Title 28 provides United States district courts with authority to assist in gathering evidence from domestic companies and persons for use in proceedings before foreign and international tribunals. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004). The statute provides in pertinent part:

> (a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person and may direct the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a). Congress intended the statute to promote the "twin aims of [] providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." *Intel*, 542 U.S. at 252 (citations omitted). For these reasons, a district court may compel discovery where it is authorized to grant the request and where it determines that it should exercise its discretion to do so. *See id.* at 264.

## I.   THIS COURT IS AUTHORIZED TO GRANT CARATUBE'S APPLICATION FOR DISCOVERY BECAUSE IT COMPLIES WITH ALL OF THE FACTORS.

This Court has authority to grant the relief sought if the following three requirements are satisfied:

> (1) that the person from whom discovery is sought resides (or be found) in the district of the district court, to which the application is made,
>
> (2) that the discovery be for use in a proceeding before a foreign tribunal, and

(3) that the application be made by a foreign or international tribunal or "any interested person."

*In re the Application of Esses*, 101 F.3d 873, 875 (2d Cir. 1996) (citations omitted). Caratube's petition for discovery meets each of these requirements.

### A. Mirtchev, Krull, GlobalOptions, BGR Group and PIC Are Found in This District.

Section 1782 authorizes this Court to compel discovery from Mirtchev, Krull, GlobalOptions, BGR Group, and PIC because each entity or person is "found" in this District. Section 1782 empowers "[t]he district court of the district in which a person resides or is found" to order discovery from that person. The term "person," as used in the statute, applies to both individuals and corporations, thus Mirtchev and the companies fall within the scope of that statute. *See, e.g., Intel*, 542 U.S. 241. A person from whom discovery is sought under § 1782 is "found" within any district in which it has a "physical presence." *In re Application of Edelman*, 295 F.3d 171, 179 (2d Cir. 2002) ("[T]he Supreme Court authorized the exercise of personal jurisdiction based on nothing more than physical presence . . . we do not think that § 1782(a), which is simply a discovery mechanism and does not subject a person to liability, requires more."). A business "resides" where it maintains its principal place of business. *See, e.g., Jackson v. Strayer College*, 941 F. Supp. 192, 195 (D.D.C. 1996) (finding corporation "is a resident of the District of Columbia by virtue of the fact that its corporate offices are located in the District of Columbia.")

Upon information and belief, Krull Corp. currently maintains (or has at some point in the past three years maintained) its headquarters at 2300 M Street, NW, Suite 800, Washington, D.C. 20037, or alternatively, is located at 1825 Eye Street, NW, Suite 400, Washington, D.C. 20006. Although Krull Corp.'s website provides no specific address, it begins with a description of the

company as "[b]ased in Washington, D.C." *See* Krull Corp., http://krullcorp.com/en/ (last visited

April 20, 2010).  Also upon information and belief, GlobalOptions, Inc. maintains an address at

1501 M St., NW, Washington, D.C. 20036 and is registered to do business in the District.

Similarly, BGR Group maintains an office at 601 Thirteenth Street, N.W., 11th Floor South,

Washington, D.C.  20005, and PIC is located at 1401 K Street, Suite 600, Washington, D.C.

20005.  Mirtchev is also present in the District.  Upon information and belief, he resides at 2201

N St., NW, Apt. 2, Washington D.C. 20037.  Thus, each of Mirtchev, Krull, GlobalOptions,

BGR Group, and PIC is "found" in Washington D.C., as required for this Court to order

discovery pursuant to § 1782.

### 1.  All Requested Documents are Within the Possession, Custody, or Control of Mirtchev, Krull, GlobalOptions, BGR Group, and PIC.

Caratube is entitled to discovery of documents held abroad by Mirtchev, Krull,

GlobalOptions, BGR Group, and PIC.  "Section 1782 requires only that that the *party* from

whom discovery is sought be 'found' here; not that the *documents* be found here." *In re*

*Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*, No. Civ. M19-88 (BSJ), 2006 WL

3844464, at *5 (S.D.N.Y. Dec. 29, 2006) (citing 28 U.S.C. § 1782(a)).  Section 1782 permits

discovery "in accordance with the Federal Rules of Civil Procedure."  Federal Rules 34 and 45

permit discovery of documents within the possession, custody, or control of an entity within the

Court's jurisdiction.  Fed. R. Civ. P. 34 & 45.  Caratube is therefore entitled to discover

documents within the possession, custody, or control of Mirtchev, Krull, GlobalOptions, BGR

Group, and PIC, whether those documents are located in the District of Columbia or with other

offices of affiliates of these entities in the United States or other countries.

**B.  Caratube Is an "Interested Person" Because It Is Party to the ICSID Proceeding.**

As a party in the underlying dispute, Caratube is an "interested person" within the

meaning of § 1782.  Caratube initiated proceedings by filing a Request for Arbitration against the

Republic of Kazakhstan before the International Centre for the Settlement of Investment

Disputes on June 16, 2008.  *See* Exhibit 6.  Caratube is precisely the type of entity for whom

Congress intended § 1782 to provide discovery assistance.

**C.  The Discovery Caratube Requests is For Use in the ICSID Arbitration.**

**1.  The ICSID Arbitration is a Proceeding Before a Foreign Tribunal.**

The ICSID Tribunal is a "foreign or international tribunal" within the meaning of §1782.

It is undisputed that the plain language of the statute encompasses state-sponsored tribunals, such

as the ICSID tribunal in this case.  Indeed, for the very purpose of including foreign tribunals

within the scope of the statute, Congress substituted the phrase "proceeding in a foreign or

international tribunal" for "court in a foreign country."  *See N.B.C., Inc. v. Bear Stearns & Co.,*

*Inc.*, 165 F.3d 184, 189 (2d Cir. 1999).  Congress did so with the intention to expand the statute

"to cover governmental or intergovernmental arbitral tribunals and conventional courts and other

state-sponsored adjudicatory bodies."  *In the Matter of the Application of Oxus Gold PLC*, MISC

No. 06-82-GEB, 2007 WL 1037387, at *5 (D.N.J. Apr. 2, 2007) (citations omitted); *see also* S.

Rep. No. 88-1580 *reprinted in* 1964 U.S.C.C.A.N. at 3788.

The proceeding underlying this § 1782 petition is a state sponsored arbitration brought

pursuant to the Bilateral Investment Treaty between the United States and Kazakhstan.  Article

VI of the BIT contains an express consent by both sovereigns to the submission of this dispute to

the International Centre for the Settlement of Investment Disputes, an autonomous international

institution established by its member states.  *See* Exhibits 25 and 26.  Indeed, Article VI (4) of

14

the BIT provides, "[e]ach party hereby consents to the submission of any investment dispute for settlement by binding arbitration in accordance with the choice specified in the written consent of the national or company under paragraph 3." Article VI (3)(a)(i) of the BIT permits the claimant to "choose to consent in writing to the submission of the dispute for settlement by binding arbitration: (i) to the International Center for the Settlement of Investment Disputes ("Center") established by the Convention on the Settlement of Investment Disputes between States and National of other States, done at Washington, March 18, 1965 [the "Washington Convention"]." Because Caratube initiated this arbitration pursuant to the U.S. - Kazakhstan BIT and the Washington Convention that established ICSID, the tribunal assembled to adjudicate the underlying dispute between Caratube and the Republic of Kazakhstan is a state-sponsored tribunal, and thus, a "foreign or international tribunal" within the meaning of the statute.

### 2. Documents that Caratube Seeks are For Use in the ICSID Arbitration.

Caratube seeks discovery through this Court "for use" in the ICSID Arbitration. As described in Caratube's Memorial submitted to the ICSID Tribunal, "the central issue in this case is the intimidation and harassment that [Caratube], its owners and employees have been subject to by various governmental authorities in Kazakhstan since the middle of 2007." *See* Claimant's Memorial, dated May 14, 2009, at ¶ 46, Exhibit 27. The task before the ICSID Tribunal is to scrutinize the governmental acts of Kazakhstan against its public international law obligations as set out in the BIT and as established under customary law, including Kazakhstan's compliance with Article II (Treatment) and Article III (Expropriation) of the BIT. To conduct this analysis, the Tribunal must consider Caratube's rights as an investor in the context of the perceived public interest of Kazakhstan. Evidence of Kazakhstan's efforts through United States entities, including Alexander Mirtchev, Krull, GlobalOptions, BGR Group, and PIC, to further its public

interests thus bears directly on the ICSID arbitration.  Specifically, documents relevant to

Kazakhstan's intentions to gather or disseminate information to harass, intimidate, defame, or

undermine Caratube, Aliyev, and members of the Hourani family.  This evidence bears directly

on the ICSID Tribunal's consideration of Kazakhstan's compliance with its obligations under the

BIT.  This is precisely the evidence that Caratube seeks in its requested discovery before this

Court.

## II.     ALL OF THE DISCRETIONARY FACTORS WEIGH IN FAVOR OF THIS COURT ORDERING THE DISCOVERY THAT CARATUBE SEEKS.

Caratube's requested relief is warranted under each of the discretionary considerations

that the United States Supreme Court has identified.  These considerations include the following:

(1) Whether the person from whom discovery is sought is a non-participant to the foreign proceeding thereby making the need for the aid more apparent;

(2) The nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government, court or agency to federal court judicial assistance, including;

(3) Whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States;  and

(4) Whether the discovery requested is unduly intrusive and burdensome.

*Intel*, 542 U.S. at 264-65.  Neither Mirtchev, Krull, GlobalOptions, BGR Group, nor PIC is a

party in the foreign proceeding and the document requests are appropriately relevant, focused,

and limited.  All of these factors weigh heavily in favor of this Court granting Caratube's request

for an order directing Mirtchev, Krull, GlobalOptions, BGR Group, and PIC to provide the

requested documents to the extent such documents are within its possession, custody, or control.

**A. Neither Mirtchev, Krull, GlobalOptions, BGR Group, Nor PIC is a Party to the Foreign Proceeding for Which Caratube Seeks Discovery.**

Neither Mirtchev, Krull, GlobalOptions, BGR Group, nor PIC is a party to the proceedings before the ICSID Tribunal and, thus, they are beyond the Tribunal's jurisdiction. For this reason, the ICSID Tribunal will be unable to compel these entities to produce documents in the proceeding before it. Unless these entities were to submit themselves to the jurisdiction of the Tribunal, this § 1782 proceeding is likely the only way that Caratube will be able to obtain the relevant documents that are within the control of these entities. *See, e.g., In re Application of Grupo Qumma,* No. M 8-85, 2005 WL 937486, at *3 (S.D.N.Y. April 22, 2005) (exercising discretion to order discovery requested by applicant, because, in part, discovery sought from non-participants in the foreign proceeding). Therefore, this factor heavily favors granting Caratube's discovery requests in this case.

**B. There is No Reason that The ICSID Tribunal Would Be Unreceptive to The Requested Evidence.**

The nature of the foreign tribunal and its receptivity to the requested evidence also favors an order for discovery under § 1782. Receptivity of a foreign tribunal is presumed unless a respondent can show "*authoritative proof* that a foreign tribunal would reject evidence obtained with the aid of § 1782."[2] *In re Application of Imanagement Serv.,* No. Misc. 05-89 (FB), 2005 WL 1959702, at *3 (citing *Euromepa v. R. Esmerian, Inc.,* 51 F.3d 1095, 1099-1100 (2d Cir. 1995)). In exercising its discretion, a court may look for "clear directive[s]," for example, a

---

[2] The U.S. Court of Appeals for the Second Circuit has noted that in the absence of authoritative proof, "it is unwise as well as in tension with the aims of section 1782 – for district judges to try to glean the accepted practices and attitudes of other nations from what are likely to be conflicting, and perhaps, biased interpretations of foreign law." *In re Application of Imanagement Serv.,* at *3 (citing *Euromepa v. R. Esmerian, Inc.,* 51 F.3d 1095, 1099-1100 (2d Cir. 1995)).

"forum country's judicial, executive or legislative declarations that *specifically address the use of evidence gathered under foreign procedures.*" *Id.* Yet here, no provision in the ICSID Rules, the U.S.-Kazakhstan BIT, the Contract between Caratube and the Republic of Kazakhstan, or the Tribunal's Procedural Orders, limits the Tribunal's use of evidence obtained through a § 1782 proceeding, or any other proceeding outside of the arbitration. Indeed, the Tribunal's Procedural Order, dated April 16, 2009 indicates at ¶ 15.4 that the Tribunal will be guided by "Articles 3 through 6 of the International Bar Association Rules on the Taking of Evidence in International Commercial Arbitration adopted by resolution of the IBA Council on 1 June 1999." ("IBA Rules"). *See* Exhibit 28. The IBA Rules explicitly anticipate the potential for the production of documents through processes external to the tribunal process.

As with all discretionary factors, this Court's ruling "should be informed by section 1782's overarching interest in 'providing equitable and efficacious procedures for the benefit of tribunals and litigants involved in litigation with international aspects.'" *Id.* (citing S.Rep. No. 88-1580, *reprinted in* 1964 U.S.C.C.A.N. at 3788). But in any event, if the ICSID Tribunal is unreceptive to the discovery, it may simply exclude the discovered material from the proceeding. *See Minatec Finances S.À.R.L. v. SI Group Inc.*, Civ. No. 1:08-CV-269 (LEK/RFT), 2008 WL 3884374, at *7 (N.D.N.Y. Aug. 18, 2008) (finding "even if a foreign tribunal may be too hesitant to order the level of production sought here, this does not mean that there is any resistance to receiving such evidence collected under [§1782]") (citing *Intel*, 542 U.S. at 261-62). Because the Tribunal will likely be receptive to the evidence discovered through this §1782 petition, no authoritative proof exists that the Tribunal will reject evidence discovered through this §1782 action, and the Tribunal may simply disregard the discovery it finds beyond the scope of this matter, this factor weighs in favor of ordering discovery in this case.

18

### C. Caratube's Requests Are Limited and Appropriate.

Caratube, as detailed in the attached Requests, Exhibits 1 to 5, seeks all documents and correspondence generally related to any investigation, monitoring, surveillance, analysis, reports, discussion and advocacy related to Caratube, its officers and employees, Caratube's owner, Devincci Hourani, and his family, including his brother Issam Hourani (also spelled "Khorani"). These requests are based on Caratube's understanding that Mirtchev, Krull, GlobalOptions, BGR Group, and PIC have each been involved in advising Kazakhstan and/or President Nazarbayev and his family on various economic and other issues, including, we believe, issues related to Aliyev and the termination of Caratube's contracts in Kazakhstan.

### Conclusion

For each of the foregoing reasons, the Court should grant the relief requested and issue an Order in the form attached requiring Mirtchev, Krull, GlobalOptions, BGR Group and PIC to respond fully and completely to the requested discovery.

Respectfully submitted,

Michael L. Martinez, DC Bar No. 347310
Stuart H. Newberger, DC Bar No. 294793
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 624-2500

April 28, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of April, 2010, I caused true and correct copies of the

foregoing "Petition of Caratube International Oil Company for Discovery in Aid of a Foreign

Proceeding Pursuant to 28 U.S.C. § 1782," with supporting exhibits and proposed Order to be

served by process server upon each individual or entity named below and also by certified mail

upon The Krull Corporation c/o Registered Agents, Ltd. 1220 N. Market St., Suite 804,

Wilmington, DE 19801.

GlobalOptions, Inc.
c/o Corporation Service Company
1090 Vermont Ave., NW
Washington D.C. 20005

Alexander V. Mirtchev
2201 N. St., NW Apt. 2
Washington, D.C. 20037

BGR Group
601 Thirteenth St., NW, 11th Fl. South
Washington, D.C. 20005

The Krull Corporation
1825 Eye St. NW
Washington, D.C. 20006

Policy Impact Strategic Communications, Inc.
c/o Daniel H. Crowley
1710 Rhode Island Ave., NW
Washington D.C. 20036

Michael L. Martinez, DC Bar No. 347310
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 624-2500

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE: | ) |
|  | ) |
|  | )   Misc. No. 10-_____ |
| APPLICATION OF CARATUBE | ) |
| INTERNATIONAL OIL COMPANY, | ) |
| 92A Polezhaeva St., | ) |
| Zhetysusskiy Region Almaty, 050050 | ) |
| Republic of Kazakhstan | ) |
|  | ) |
|    Applicant. | ) |

## INDEX OF EXHIBITS

1. Subpoena and Request for Documents to Alexander Mirtchev.

2. Subpoena and Request for Documents to Krull Corporation.

3. Subpoena and Request for Documents to Global Options, Inc.

4. Subpoena and Request for Documents to BGR Group.

5. Subpoena and Request for Documents to Policy Impact Strategic Communications.

6. *Caratube Intn'l Oil Co. v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Request for Arbitration of Caratube International Oil Company dated June 16, 2008.

7. Description of Dr. Alexander Mirtchev from Krull Corporation website.

8. *Kazakh stabilization plan starts to take shape, available at* http://emergingmarketsnews.com/archive/23, November 28, 2008.

9. Glenn R. Simpson and Susan Schmidt, *Kazakhstan Corruption: Exile New Details*, WALL STREET JOURNAL, July 23, 2008.

10. Business Cards of Dr. Alexander Mirtchev.

11. Krull Corporation, www.krullcorp.com.

12. Business records report of GlobalOptions Inc.

13. Glenn R. Simpson, Susan Schmidt, and Mary Jacoby, *Kazakh Leader's Daughter Monitored U.S. Bribe Case*, WALL STREET JOURNAL, May 12, 2008.

14. The Aliyev Dossier.

15. Email from the Eurasian Transition Group to Krull CEO dated July 15, 2009

16. *The Former Kazakh FBI Apprentice From Jack the Ripper To a Democrat*, *available at* http://www.kazakhembus.com/index.php?mact=News,cntnt01,detail,0&cntnt01articleid=161&cntnt01returnid=90, December 18, 2008.

17. Exhibit A to the Registration Statement of BGR Public Relations LLC.

18. Memo entitled, "Meeting with Barbour, Griffith & Rogers (BGR)."

19. BGR Group History, *available at* http://www.bgrdc.com/about-history.html.

20. Policy Impact Strategic Communications History, *available at* http://www.policyimpact.com/index.php/about.

21. Lisa Brennan, *SDNY Shakes Up Team on Long-Stalled Kazakh Bribe Case*, April 15, 2010, *available at* www.mainjustice.com.

22. Exhibit A to the Registration Statement of Policy Impact Strategic Communications.

23. Short Form Registration of William Nixon.

24. Short Form Registration of Yerbol Bekmyrza.

25. Treaty between the United States of America and the Republic of Kazakhstan Concerning the Encouragement and Reciprocal Protection of Investment, U.S.-Kazakhstan, May 19, 1992, S. TREATY NO. 103-12 (1993).

26. ICSID Convention, Regulations and Rules, *available at* http://icsid.worldbank.org/ICSID/ICSID/RulesMain.jsp.

27. *Caratube Intn'l Oil Co. v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Claimant's Memorial on Merits dated May 14, 2009.

28. *Caratube Intn'l Oil Co. v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Minutes of the First Session dated April 16, 2009.