Joseph D. Pizzurro (D.C. Bar No. 468922)
CURTIS, MALLET-PREVOST,
    COLT & MOSLE LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 452-7373
Fax: (202) 452-7333

*Attorneys for Republic of Kazakhstan*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------------------ X

IN RE:                                                          :

APPLICATION OF CARATUBE                          :
INTERNATIONAL OIL COMPANY,                    Case No. 1:10-mc-00285
92A Polezhaeva St.,                                          :
Zhetysusskiy Region Almaty, 050050
Republic of Kazakhstan                                    :
                                             Applicant.
                                                                      :
------------------------------------------------------------------------ X

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION OF THE REPUBLIC OF KAZAKHSTAN TO INTERVENE PURSUANT TO RULE 24(a) OF THE FEDERAL RULES OF CIVIL PROCEDURE AND IN OPPOSITION TO CIOC'S PETITION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

Dated: Washington, D.C.
        May 28, 2010

## Table of Contents

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

A.    Nature of ICSID ................................................................................................ 4

B.    Constitution of the ICSID Panel In This Case ................................................. 8

C.    The Panel's Orders With Respect To Discovery.............................................. 9

D.    CIOC's Petition .............................................................................................. 12

ARGUMENT ................................................................................................................. 13

POINT I THE REPUBLIC HAS A RIGHT TO INTERVENE
TO OPPOSE CIOC'S 28 U.S.C. § 1782 PETITION ................................................... 13

POINT II SECTION 1782 DOES NOT APPLY
TO AN INTERNATIONAL ARBITRAL PANEL ....................................................... 15

POINT III ASSUMING ARGUENDO THAT § 1782 APPLIES
IN THIS CASE, THE *INTEL* FACTORS PRECLUDE A GRANT
OF THE REQUESTED DISCOVERY .......................................................................... 20

A.    The Nature of the ICSID Arbitral Panel And The Character
of the ICSID Arbitral Proceeding Militate Against
Judicial Assistance In The Form of § 1782 Discovery ......................................... 21

B.    The Petition Conceals An Attempt To Circumvent
The ICSID Panel's Discovery Procedures ............................................................ 25

C.    CIOC's Requests Are Unduly Intrusive And Burdensome
Given Their Lack Of Precision And Over-Breadth .............................................. 27

CONCLUSION .............................................................................................................. 30

# Table of Authorities

**Page(s)**

## Cases

*Aventis Pharma v. Wyeth,*
  M-19-70, 2009 U.S. Dist. LEXIS 105422 (S.D.N.Y. Nov. 9, 2009)......................................... 27

*El Paso Corp. v. La Comision Ejecutiva Hidroelectrica del Rio Lempa,*
  341 F. App'x 31 (5th Cir. 2009) ........................................................................... 15, 17

*In re Application of Chevron Corp.,*
  __ F. Supp. 2d __, No. M-19-111, 2010 WL 1801526 (S.D.N.Y. May 6, 2010).................... 20

*In re Application of Heraeus Kulzer,*
  3:09-MC-08, 2009 U.S. Dist. LEXIS 29771 (N.D. Ind. Apr. 8, 2009) .................................. 29

*In re Application of Operadora DB Mexico, S.A. de C.V.,*
  6:09-cv-383-Orl-22GJK, 2009 WL 2423138 (M.D. Fla. Aug. 4, 2009) ..................... 18, 19, 29

*In re Application of Sarrio, S.A.,*
  119 F.3d 143 (2d Cir. 1997) ....................................................................................... 14

*In re Arbitration in London, England,*
  626 F. Supp. 2d 882 (N.D. Ill. 2009) ......................................................................... 18

*In re Letter of Request from the Crown Prosecution Service of the United Kingdom,*
  870 F.2d 686 (D.C. Cir. 1989)..................................................................... 13, 14, 15

*In re Letter Rogatory from the Justice Court,*
  523 F.2d 562 (6th Cir. 1975) ....................................................................................... 14

*In the Matter of the Application of Oxus Gold PLC,*
  Misc. No. 06-82-GEB, 2007 WL 1037387 (D.N.J. Apr. 2, 2007) .................................. 18, 20

*Intel Corp. v. Advanced Micro Devices, Inc.,*
  542 U.S. 241 (2004)............................................................................................ *passim*

*La Comision Ejecutiva Hidroelecctrica Del Rio Lempa v. El Paso Corp.,*
  617 F. Supp. 2d 481 (S.D. Tex. 2008)
  *aff'd,* 341 F. App'x 31 (5th Cir. 2009)........................................................................ 18

*Nat'l Broad. Co. v. Bear Stearns & Co.,*
  165 F.3d 184 (2d Cir. 1999) .............................................................................. *passim*

*Republic of Kazakhstan v. Biedermann Int'l,*
  168 F.3d 880 (5th Cir. 1999) ....................................................................... 15, 16, 17, 29

*Smoke v. Norton,*
  252 F.3d 468 (D.C. Cir. 2001)................................................................................... 13

*Williams & Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.,*
  840 F.2d 72 (D.C. Cir. 1988) ................................................................................... 13

*Wyoming v. United States Dep't of Agriculture,*
  208 F.R.D. 449 (D.D.C. 2002) .................................................................................. 28

**Statutes**

28 U.S.C. § 1782 ............................................................................................. *passim*

**Rules**

Federal Rules of Civil Procedure 24(a) ................................................................ 1, 13

**Treaties**

Agreement for the Promotion and Protection of Investments,
  U.K.-Kyrg., at Art. 8, Dec. 8, 1994, U.K.T.S. 7 (1999) ......................................... 20

Convention on the Settlement of Investment Disputes
  between States and Nationals of Other States ................................................... *passim*

Treaty Concerning the Encouragement and Reciprocal Protection of Investment,
  U.S.-Ecuador, at Art. VI, Aug. 27, 1993, S. TREATY DOC. NO. 103-15 (1993)........................ 20

Treaty Concerning the Reciprocal Encouragement and Protection of Investment,
  U.S.-Kaz., at Art. VI, May 19, 1992, S. TREATY DOC. NO. 103-12 (1993).................... 3, 19, 20

**Other Authorities**

A. REDFERN & M. HUNTER,
  LAW AND PRACTICE OF INTERNATIONAL COMMERCIAL ARBITRATION (4th ed. 2004).......... 7, 19

C.H. SCHREUER,
  THE ICSID CONVENTION: A COMMENTARY (2d ed. 2009) ................................................. *passim*

Georges R. Delaume,
  *ICSID Arbitration and the Courts,* 77 AM. J. INT'L L. 784 (1983) .................................... 7, 8, 19

H. SMIT & V. PECHOTA,
  ARBITRATION RULES – INTERNATIONAL INSTITUTIONS (2d ed. 2007) ......................................... 3

IBA Working Party, *Commentary on the New IBA Rules of Evidence in International
  Commercial Arbitration,* BUS. L. INT'L, Issue 2 (January 2000)............................................. 25

ICSID Rules of Procedure for Arbitration Proceedings ................................................ 8, 9, 25, 26

International Bar Association's Rules on the Taking of Evidence
  in International Commercial Arbitration, Article 3, Rule 8.................................... 10, 11, 25, 26

John Fellas,
  *Using Section 1782 in International Arbitration,*
  23(3) ARBITRATION INT'L 379 (Kluwer Law International 2007) ............................................ 23

Martin Illmer & Ben Steinbrück,
  *U.S. Discovery and Foreign Private Arbitration: The Foreign Lawyer's Perspective,*
  25(3) JOURNAL OF INT'L ARBITRATION 329 (Kluwer Law International 2008)........................ 23

REPORT OF THE EXECUTIVE DIRECTORS ON THE CONVENTION ON THE SETTLEMENT
OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES................. 4, 6

S. Jagusch & J. Sullivan,
*A Comparison of ICSID and UNCITRAL Arbitration*,
*in* THE BACKLASH AGAINST INVESTMENT ARBITRATION 97 (K. Waibel ed., 2010).................. 6

S. REP. NO. 88-1580 (1964),
*reprinted in* 1964 U.S.S.C.A.N. 3782........................................................................................ 17

## PRELIMINARY STATEMENT

The Republic of Kazakhstan (the "Republic") respectfully submits this memorandum of points and authorities in support of its motion to intervene pursuant to Rule 24(a) of the Federal Rules of Civil Procedure and in opposition to the Petition of Caratube International Oil Company, LLP ("CIOC," or "Petitioner") for Discovery In Aid of A Foreign Proceeding Pursuant to 28 U.S.C. § 1782 (the "Petition"). The law is clear that the Republic has standing to oppose the Petition. It is equally clear that the Petition is without basis in law and should be denied.

CIOC commenced a commercial arbitration pursuant to the arbitration rules of the International Centre for Settlement of Investment Disputes ("ICSID," or the "Centre"), concerning the Republic's termination of a contract with CIOC for the exploration and production of hydrocarbons in areas of the Republic. CIOC now requests – in direct contravention of the procedural rules for discovery which CIOC itself proposed, and which the ICSID arbitral panel instituted – that this Court order a broad and irrelevant range of document production from five non-parties to the arbitration.

The Petition should be denied. An international arbitral panel is not a "foreign or international tribunal" within the meaning of § 1782. The Supreme Court has never ruled on this issue, and every Circuit Court of Appeals to have addressed this issue has held, and the legislative history and purpose behind § 1782 establishes, that an international arbitral panel is not a "tribunal" within the meaning of the statute.

Further, even if § 1782 did apply, the Supreme Court has made clear that a grant of § 1782 discovery is not mandatory but is within the district court's discretion. An application of the factors which this Court must consider in determining whether to grant the discovery sought by CIOC dooms its Petition.

CIOC's Petition raises only mere innuendo and speculative suggestion in the hopes of obtaining leave to embark on a fishing expedition for information largely irrelevant to its winding theory of political revenge.  To grant the requested non-party discovery will result only in undermining the essential attributes of the arbitral process and the very procedures for limited discovery adopted by the arbitral panel with the consent of the parties.

The Petition should be denied.

## STATEMENT OF FACTS

In 2002, CIOC, as a result of an assignment, became a party with the Republic to the Contract For Exploration and Production of Hydrocarbons within Blocks XXIV-20-C (partially); XXIV-21-A (partially), including Karatube Field in the Baiganin District of Aktobe Oblast of the Republic of Kazakhstan (the "Contract").  (Wolrich Decl. ¶ 4.)[1]

In 2008, the Republic terminated the Contract as a result of CIOC's breaches.  (*Id.* ¶ 5.)  Specifically, the Republic maintains that CIOC breached its minimum work program obligations and annual work program obligations, including failing to timely perform a 3D seismic survey, failing to drill or to commence drilling certain wells, failing to complete and put in commission oil collection, storage and treatment facilities and equipment, failing to meet annual financial obligations, and failing to reach trial oil production targets.  *See* Republic's Counter-Memorial on Objections to Jurisdiction and The Merits, *Caratube Int'l Oil Company LLP v. The Republic of Kazakhstan*, ICSID Case No. ARB/08/12 (the "Counter-Memorial"), at pp. 44-56.  (Wolrich Decl. Ex. A.)

In 2008, CIOC initiated an arbitration against the Republic, raising claims against the Republic pursuant to the Treaty Between the United States of America and the Republic of

---

[1] References in the form "Wolrich Decl. ¶ __" are to the Declaration of Peter M. Wolrich dated May 27, 2010, submitted herewith in support of the Republic's Motion.

Kazakhstan Concerning the Reciprocal Encouragement and Protection of Investment, which was signed on May 19, 1992 and entered into force on January 12, 1994 (the "BIT") (Wolrich Decl. ¶ 6, Ex. B).

Pursuant to the BIT, in the event of an investment dispute, CIOC had the option of pursuing its claims in the courts of Kazakhstan or submitting the dispute for settlement by binding arbitration either:

> (i)    to the International Centre for the Settlement of Investment Disputes ("Centre") established by the Convention on the Settlement of Investment Disputes between States and Nationals of other States, done at Washington, March 18, 1965 ("ICSID Convention"), provided that the party is a Party to such Convention;[2] or
>
> (ii)    to the Additional Facility of the Centre, if the Centre is not available; or
>
> (iii)    in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL);[3] or
>
> (iv)    to any other arbitration institution, or in accordance with any other arbitration rules, as may be mutually agreed between the parties to the dispute.

BIT, Art. VI, ¶ 3 (Wolrich Decl. Ex. B).

CIOC chose to have the dispute decided in an ICSID arbitration pursuant to Article VI, ¶ 3(i) of the BIT.  (Wolrich Decl. ¶ 8.)

---

[2] Both the United States and Kazakhstan are parties to the ICSID Convention.

[3] UNCITRAL is not an arbitral institution but rather refers to a body of rules drawn up in 1976 by the United Nations Commission on International Trade Law. *See* H. SMIT & V. PECHOTA, ARBITRATION RULES – INTERNATIONAL INSTITUTIONS, at 1-1 (2d ed. 2007).  The UNCITRAL rules were designed to provide a set of rules for commercial arbitration that could be used in countries with different legal and economic systems; today, the UNCITRAL rules are used not only in *ad hoc* arbitral proceedings but also by various arbitral institutions. *See id*. at 1-2.  An ICSID arbitration, however, is governed by its own body of arbitration rules and does not follow the UNCITRAL rules.

## A.    Nature of ICSID

The Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention") was formulated by the World Bank in 1965 in an effort to facilitate the settlement of disputes between member States and nationals of other member States.[4]  *See* ICSID CONVENTION, REGULATIONS AND RULES,[5] at 5 (April 2006); REPORT OF THE EXECUTIVE DIRECTORS ON THE CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES,[6] Section I ¶ 1 (1965) (hereinafter EXECUTIVE DIRECTORS' REPORT).

The ICSID Convention is an international treaty to which 155 member states have adhered.  *See* http://icsid.worldbank.org/ICSID/ (follow "Member States" hyperlink).  The ICSID Convention in turn established ICSID as an "autonomous international institution" whose purpose is to "provide facilities for conciliation and arbitration of international investment disputes."  http://icsid.worldbank.org/ICSID/ICSID/AboutICSID_Home.jsp.

The jurisdiction of ICSID "extend[s] to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State[.]"  ICSID Convention, Art. 25(1).  However, ICSID itself does not engage in conciliation or arbitration activities.  *See* EXECUTIVE DIRECTORS' REPORT, Section IV ¶ 15.

ICSID does not adjudicate disputes submitted to arbitration; its role in an arbitration is purely administrative, not judicial.  *See id.* ("The Centre will not itself engage in conciliation or arbitration activities.  This will be the task of Conciliation Commissions and

---

[4] ICSID was born out of an effort "to remove major impediments to the free international flows of private investment posed by non-commercial risks and the absence of specialized international methods for investment dispute settlement."  http://icsid.worldbank.org/ICSID/ICSID/AboutICSID_Home.jsp.

[5] *Available at* http://icsid.worldbank.org/ICSID/StaticFiles/basicdoc/CRR_English-final.pdf.

[6] *Available at* http://icsid.worldbank.org/ICSID/StaticFiles/basicdoc/partB-section01.htm.

Arbitral Tribunals constituted in accordance with the provisions of the Convention."). *See also*

C.H. SCHREUER, THE ICSID CONVENTION: A COMMENTARY, at 10 (2d ed. 2009) (hereinafter

ICSID COMMENTARY) (the Centre's task is administrative, not judicial).

Rather, the parties themselves choose their own arbitration panels, and the

proceedings before these panels are governed by the rules adopted by ICSID. *See* ICSID

Convention, Art. 44; ICSID COMMENTARY, at 476. Recourse to an ICSID arbitration is thus

purely a matter of the parties' consent. *See* ICSID Convention, Art. 25. No party can be forced

to arbitrate pursuant to the ICSID rules. The parties must instead consent to arbitrate pursuant to

the ICSID rules as a matter of their agreement. *See* ICSID COMMENTARY, at 9. *See also id.* at

190 ("Consent by both or all parties is an indispensible condition for the jurisdiction of the

Centre.").

Fundamentally, an ICSID arbitral panel is like any other private arbitral panel –

its authority and power derives from the parties' agreement to arbitrate, and not from any

sovereign power or state authority. The arbitral panel is a creature of contract, not an

instrumentality of any state or group of states. The ICSID Convention, although it established

the Centre, did not establish any sort of supervisory or institutional arbitral body under the aegis

of one of more states.[7] Rather, the myriad ICSID arbitral tribunals currently working across the

globe to resolve various investment disputes between sovereign states and nationals of other

states are purely private panels of arbitrators whom the parties have agreed upon and appointed,

independent of any state, governmental or quasi-governmental control or supervision. *See*

---

[7] In the event a party seeks revision of an ICSID award on the limited grounds afforded by the Convention, then application must be made to the Secretary-General of ICSID. *See* ICSID Convention, Art. 51(1). However, the request for revision is considered by the tribunal which rendered the award. *See id.* Art. 51(3). If review by the original tribunal is not possible, a new tribunal is constituted for purposes of considering the request. *See id.*

EXECUTIVE DIRECTORS' REPORT, Section IV ¶ 15.  *See also* ICSID Convention, Art. 37; ICSID

COMMENTARY, at 476 (guiding principle of Article 37 is "freedom of choice" of arbitrators).

Like any other private international arbitral panel, an ICSID arbitral panel is not

vested with any form of municipal, state or sovereign authority.  *See* S. Jagusch & J. Sullivan, *A*

*Comparison of ICSID and UNCITRAL Arbitration*, *in* THE BACKLASH AGAINST INVESTMENT

ARBITRATION 97 (K. Waibel ed., 2010) ("The Convention, due to its status as an international

treaty, provides for a system of arbitration ... that ... exists outside the realms of national law and

functions in total independence from domestic legal systems.") (internal quotations and citation

omitted).  No different than any other international arbitral panel, such as an arbitration

administered by the International Chamber of Commerce ("ICC") or an *ad hoc* international

arbitral panel, an ICSID arbitral panel has no legal authority to issue compulsory process or to

compel witnesses to testify.  *See* ICSID COMMENTARY, at 654 ("[I]t is clear that a tribunal has no

power to compel a witness's appearance.") (internal citation omitted).  Nor can an ICSID arbitral

panel enforce its own orders concerning interim measures (such as the freezing of assets).

Rather, a party would have to resort to a national or state court of competent jurisdiction for any

such enforcement action.  *See, e.g.*, ICSID COMMENTARY, at 1125-28 (to the extent provisional

measures are incorporated into or reflected in award, legal consequences for non-compliance

with provisional relief can occur only after award has been recognized and enforced by a court or

other authority); *id.* at 656-57 (tribunal cannot force a party to comply with a provisional

measure); *id.* at 1106-09 (although parties to ICSID arbitration have an obligation to abide by

and comply with the terms of an award, if the parties do not voluntarily comply, legal action is

required to secure compliance).

Precisely because an ICSID arbitration "is governed by an international treaty, rather than by a national law, [it] is truly delocalised and denationalised" – it is not state-sponsored. A. REDFERN & M. HUNTER, LAW AND PRACTICE OF INTERNATIONAL COMMERCIAL ARBITRATION, at 57 (4th ed. 2004) (hereinafter REDFERN, LAW AND PRACTICE OF INTERNATIONAL COMMERCIAL ARBITRATION). *See also* Georges R. Delaume, *ICSID Arbitration and the Courts*, 77 AM. J. INT'L L. 784, 784 (1983) (hereinafter Delaume, *ICSID Arbitration and the Courts*) ("Within the framework of the Convention and of the Regulations and Rules adopted for its implementation, ICSID arbitration constitutes a self-contained machinery functioning in total independence from domestic legal systems.").

The provisions of the ICSID Convention governing challenge, recognition and enforcement of an ICSID award establish that national law is excluded from, and has no control over, an ICSID arbitration. *See* REDFERN, LAW AND PRACTICE OF INTERNATIONAL COMMERCIAL ARBITRATION, at 57. Pursuant to Article 53 of the Convention, the award of an ICSID arbitral panel "shall be binding on the parties and *shall not be subject to any appeal or to any other remedy except those provided for in th[e] Convention*." ICSID Convention, Art. 53 (emphasis added).

Likewise, Article 26 of the ICSID Convention provides that the parties' consent to arbitration under the ICSID Convention "shall, unless otherwise stated, be deemed consent to such arbitration *to the exclusion of any other remedy*." ICSID Convention, Art. 26 (emphasis added). Thus, "[b]y submitting to ICSID arbitration, the parties therefore have the assurance that they may take full advantage of procedural rules specifically adapted to their needs and, equally important, *that the administration of these rules will be exempt from the scrutiny or control of domestic courts in states that are parties to the Convention. . . .*" Delaume, *ICSID Arbitration*

*and the Courts*, at 784-85 (emphasis added). *See* ICSID COMMENTARY, at 351 ("Art. 26 is the clearest expression of the self-contained and autonomous nature of the arbitration procedure provided for by the Convention. . . . [O]nce consent to ICSID arbitration has been given, the parties have lost their right to seek relief in another forum, national or international, and are restricted to pursuing their claim through ICSID. . . . The second feature of Art. 26, first sentence, is that of non-interference with the ICSID arbitration process once it has been instituted.  The principle of non-interference is a consequence of the self-contained nature of proceedings under the Convention.  The Convention provides for an elaborate process designed to make arbitration independent of domestic courts.").

**B.**     **Constitution of the ICSID Panel In This Case**

Pursuant to the ICSID Convention and the ICSID Rules of Procedure for Arbitration Proceedings (the "Arbitration Rules"), the parties to an ICSID arbitration have the freedom to select the members of their arbitral panel; the panel simply must consist of either a sole arbitrator or any uneven number of appointed arbitrators as the parties so agree. *See* ICSID Convention, Art. 37(2)(a); Arbitration Rule 1.[8]  If the parties cannot agree on the number of arbitrators and the method of their appointment, the ICSID Convention and Arbitration Rules provide that the panel will consist of three arbitrators, one arbitrator appointed by each party and a third, who is to serve as the president of the panel, appointed by agreement of the parties. *See* ICSID Convention, Art. 37(2)(b); Arbitration Rule 3.  If the parties cannot agree on the third arbitrator, ICSID's Chairman of the Administrative Council appoints the arbitrator. *See* ICSID Convention, Art. 38; Arbitration Rule 4.

---

[8] The ICSID Convention and Arbitration Rules also contain rules governing the nationality of the arbitrators. *See* ICSID Convention, Art. 39; Arbitration Rule 1.

In this case, each side appointed an arbitrator. (Wolrich Decl. ¶ 9.) When the parties were unable to agree upon a third arbitrator, ICSID's Chairman of the Administrative Council made the appointment. (*Id.*) All three arbitrators are private practitioners of law from various jurisdictions, including Australia, England and Germany. (*Id.*)

**C.    The Panel's Orders With Respect To Discovery**

Pursuant to the ICSID Convention and Arbitration Rules, discovery is limited to the panel's ability to (a) "call upon *the parties* to produce documents or other evidence," and (b) "visit the scene connected with the dispute, and conduct such inquiries there as [the panel] may deem appropriate." ICSID Convention, Art. 43 (emphasis added). *See also* Arbitration Rule 34(2). The parties, however, may "otherwise agree" to expand the scope of document or evidence production beyond these two categories. *See* ICSID Convention, Art. 43.

The arbitral panel in this case held a First Session on April 16, 2009. (Wolrich Decl. ¶ 10.) Prior to the First Session, the parties made a Joint Submission outlining the points of their agreement with respect to the arbitration procedures. (*See id.*, Ex. C, Minutes of the First Session of the Arbitral Tribunal, Annex 2.) At the First Session, the panel put into place a very specific procedure and schedule for the next phases of the arbitration, including requests for and production of documents by the parties, briefing on various aspects of the case and a hearing. (Wolrich Decl. ¶¶ 10, 11, Ex. C at ¶ 14.) Nothing in that schedule contemplates any discovery from non-parties to the arbitration.

Prior to the holding of the First Session, CIOC never sought an agreement from the Republic to go beyond the scope of discovery permitted by Article 43 of the ICSID Convention and Arbitration Rule 34(2). (Wolrich Decl. ¶ 12.) There was no discussion between the parties concerning the need or opportunity for non-party discovery, and neither party had made any written submission requesting the opportunity for non-party discovery. (*Id.*)

However, CIOC proposed that the panel may be guided by Articles 3 through 6 of the

International Bar Association's Rules on the Taking of Evidence in International Commercial

Arbitration adopted by resolution of the IBA Council on June 1, 1999 (the "IBA Rules"). (*See*

*id.*, Ex. C, Annex 2 at ¶ 15.4.) The Republic did not oppose this proposal and the panel accepted

to be guided by the IBA Rules. (*See id.*, Ex. C at ¶ 15.4.)

      The IBA Rules, at Article 3, Rule 8 ("IBA Rule 3.8"), specifically address the

issue of non-party discovery.  IBA Rule 3.8 provides:

> If a Party wishes to obtain the production of documents
> from a person or organization who is not a Party to the
> arbitration and from whom the Party cannot obtain the
> documents on its own, the Party may, within the time
> ordered by the Arbitral Tribunal, ask it to take whatever
> steps are legally available to obtain the requested
> documents. The Party shall identify the documents in
> sufficient detail and state why such documents are relevant
> and material to the outcome of the case. The Arbitral
> Tribunal shall decide on this request and shall take the
> necessary steps if in its discretion it determines that the
> documents would be relevant and material.

IBA Rule 3.8 (Wolrich Decl. Ex. D.)

      IBA Rule 3.8 thus contemplates that a party may seek or obtain documents from a

person or organization who is not a party to the arbitration directly from that non-party.  CIOC

apparently never took this step in this case.  In the event a party is unable to obtain documents

from a non-party directly, IBA Rule 3.8 then permits the party to ask the arbitral tribunal to take

whatever legal steps are necessary to obtain such documents.  The tribunal then is to consider the

request and determine whether the documents would be relevant and material, before deciding

whether or not to take steps to obtain the non-party documents.

      Over the course of the arbitral proceeding, the parties made various submissions

concerning discovery and document production.  (Wolrich Decl. ¶ 14.)  On April 26, 2010, the

panel issued Procedural Order (PO) No. 2 Regarding Document Production, wherein it made a series of decisions as to the parties' document production and ordered that the documents were to be exchanged within four weeks. (*See* Wolrich Decl. Ex. E.)  In so doing, the panel stated that it was relying upon the IBA Rules as a guideline, giving indications regarding the relevant criteria for what documents may be requested and ordered to be produced. (*Id.*, ¶ 1.2.)

The panel further stated:

> 1.3. The Tribunal recognizes that, on one hand, requests and orders regarding the production of documents are today a regular feature of international arbitration, but, on the other hand, *the present arbitration is a case also involving Parties domiciled in Kazakhstan which is predominantly a Civil Law country where production of documents is far less used than in Common Law countries.*

> 1.4. The Tribunal further recognizes that, on one hand, ordering the production of documents can be helpful for a party to present its case and for the Tribunal to establish the facts relevant for the issues to be decided.  But, on the other hand, *the process of discovery and disclosure may be time-consuming, excessively burdensome and even oppressive. Unless carefully limited, the burden may even be disproportionate to the value of the result.  Furthermore, Parties may have a legitimate interest of confidentiality.*

(Wolrich Decl. Ex. E at ¶¶ 1.3, 1.4 (emphasis added).)

On April 29, 2010, CIOC sent a letter to the panel, stating that CIOC had unilaterally filed its § 1782 Petition with this Court. (Wolrich Decl. ¶ 16.)  CIOC requested a minimum six-month extension of the arbitral proceedings based in large part on its perceived need to obtain documents from the five non-parties named in the Petition for use in the arbitration. (*Id.*)  The Republic opposed CIOC's request. (*Id.* ¶ 17.)

On May 26, 2010, the panel issued Procedural Order (PO) No. 3, in which it denied CIOC's request for any extension of the arbitral proceeding. (*Id.* ¶ 18, Ex. F.)  And while

the panel did not order CIOC to withdraw its § 1782 Petition, it made clear its displeasure with

the fact that CIOC never approached the panel in the first instance and refused to make any

accommodation to CIOC with respect to the introduction into evidence of any documents that

might be obtained by virtue of the § 1782 Petition.  The panel stated as follows:

> [W]hilst the Tribunal might have been minded to find that
> its prior consent should have been sought by Claimant
> before the presentation of its Section 1782 petition, the
> Tribunal concludes that it is not necessary for it to order
> Claimant to cease and desist from the US action.  A party
> starting a Section 1782 procedure before the US courts
> does so and chooses the time for such a petition at its own
> risk.  But the existence of such a petition to domestic courts
> cannot interfere with the Tribunal's maintenance of its
> authority over the arbitral procedure and with the timetable
> established with the consent of the Parties.

(Wolrich Decl. Ex. F at ¶ 2.6.)

## D.   **CIOC's Petition**

The Petition itself presents nothing more than a speculative tale woven from

political intrigue and unfounded suspicion.  The notion that the Republic terminated CIOC's

contract out of retaliation because the brother of CIOC's majority owner is married to the sister

of the former son-in-law of the President of Kazakhstan, and because the former son-in-law had

opposed the President's proposed amendment to Kazakhstan's Constitution or otherwise

criticized him, is attenuated enough.  Yet even if one were to accept the truth of CIOC's

theorized allegations of indirect revenge, the document requests themselves are in large part so

broad and loosely designed that they cannot justify the claim that such documents, from wholly

unrelated non-parties, will substantiate CIOC's theory as to why the Republic terminated its

contract.

The Petition is premised on nothing more than the obtuse premise that a person or

entity which may have worked for, advised or lobbied on behalf of Kazakhstan will have

documents that substantiate CIOC's theory of political revenge.  The requests for documents

from these non-parties, in large part seeking virtually *all* documents concerning the Government

of Kazakhstan, its President and various family members, are far too generalized to warrant an

intrusion upon the arbitral proceeding in this case.

## ARGUMENT

### POINT I

### THE REPUBLIC HAS A RIGHT TO INTERVENE<br>TO OPPOSE CIOC'S 28 U.S.C. § 1782 PETITION

It is beyond doubt that the Republic has a right to intervene in this case to oppose

CIOC's petition.  As the other party to the proceeding in which the information sought will be

used, the Republic has an undeniable interest, and the law is clear in this Circuit that the

Republic has a right to appear and defend that interest by opposing the Petition.  *See In re Letter*

*of Request from the Crown Prosecution Service of the United Kingdom*, 870 F.2d 686, 689 (D.C.

Cir. 1989).

Rule 24(a) governs intervention as of right and states in relevant part:

> On timely motion, the court must permit anyone to
> intervene who . . . claims an interest relating to the property
> or transaction that is the subject of the action, and is so
> situated that disposing of the action may as a practical
> matter impair or impede the movant's ability to protect its
> interest, unless existing parties adequately represent that
> interest.

Fed. R. Civ. P. 24(a)(2).  *See Smoke v. Norton*, 252 F.3d 468, 470 (D.C. Cir. 2001) ("[T]he four

requirements for intervention as of right under Rule 24(a)(2) [are]:  (1) timeliness; (2) a

cognizable interest; (3) impairment of that interest; and (4) lack of adequate representation by

existing parties.") (internal quotations and citations omitted); *Williams & Humbert Ltd. v. W. &*

*H. Trade Marks (Jersey) Ltd.*, 840 F.2d 72, 74 (D.C. Cir. 1988) (same).

Because the District Court's May 10, 2010 Order states that respondents must show cause why CIOC's petition for discovery should not be granted "by not later than May 28, 2010," the Republic has asserted its rights in a timely manner.

A party to the proceeding in which the information sought may be used has standing to oppose the petition. The United States Court of Appeals for the District of Columbia has noted that: "The precedent in point is uniform and we adhere to it. A person ... against whom information obtained under section 1782 may be used has standing to assert that, to his detriment, the authority for which the section provides is being abused." *In re Letter of Request from the Crown Prosecution Service*, 870 F.2d at 689. *See also In re Application of Sarrio, S.A.*, 119 F.3d 143, 148 (2d Cir. 1997) ("[P]arties against whom the requested information will be used may have standing to challenge the lawfulness of discovery orders directed to third parties."); *In re Letter Rogatory from the Justice Court*, 523 F.2d 562, 564 (6th Cir. 1975) ("Thus a party against whom the requested information is to be used has standing to challenge the validity of such a subpoena on the ground that it is in excess of the terms of the applicable statute, here 28 U.S.C. § 1782.").

Because the Republic has standing to challenge CIOC's petition, it has a protectable interest sufficient for intervention as of right. Furthermore, there is no other party which shares that interest, *i.e.*, there is no other party which has an interest in the arbitration with CIOC, and thus no other party that can adequately represent that interest.

## POINT II

## <u>SECTION 1782 DOES NOT APPLY TO AN INTERNATIONAL ARBITRAL PANEL</u>

Section 1782(a) provides, in relevant part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a *foreign or international tribunal*, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. . . .

28 U.S.C. § 1782 (emphasis added).

Every Circuit Court of Appeals which has addressed this issue has squarely held that an international arbitral panel is not a "tribunal" within the meaning of § 1782. *See Nat'l Broad. Co. v. Bear Stearns & Co.*, 165 F.3d 184, 188-90 (2d Cir. 1999) ("*NBC*"); *Republic of Kazakhstan v. Biedermann Int'l*, 168 F.3d 880, 883 (5th Cir. 1999); *El Paso Corp. v. La Comision Ejecutiva Hidroelectrica del Rio Lempa*, 341 F. App'x 31, 33-34 (5th Cir. 2009).  And while the Court of Appeals for the District of Columbia Circuit has not ruled directly on this issue, it has squarely held that the proceedings for which assistance is sought under § 1782 must be "judicial."  *See In re Letter of Request from the Crown Prosecution Service*, 870 F.2d at 690-91.[9]

In *NBC*, the Second Circuit held that a commercial arbitration conducted abroad under the auspices of the ICC is not a "proceeding in a foreign or international tribunal" within the meaning of § 1782.  The court examined the legislative history and purpose of § 1782 and

---

[9] The issue of what constitutes a "tribunal" as that term is used in the statute was not at issue in the case.

concluded that the term "tribunal" was intended to cover only a "foreign administrative tribunal or quasi-judicial agency" or "governmental or intergovernmental arbitral tribunals and conventional courts and other state-sponsored adjudicatory bodies." *NBC*, 165 F.3d at 189-90. The court concluded that the absence of any reference in the legislative history to "private dispute resolution proceedings such as arbitration strongly suggests" that Congress did not mean to include these within the ambit of § 1782. *Id.* at 189.

The court in *NBC* further found Congress would not have lightly undertaken to expand judicial assistance to international arbitral panels created by private parties without at least a mention of such legislative intent. *See id.* at 190. The court noted the difference between the broad-ranging discovery permitted by the Federal Rules when a § 1782 application is granted versus the limitations on discovery contained in the Federal Arbitration Act. Applying § 1782 to arbitral panels would create an inconsistency between domestic arbitral panels and international arbitral panels that "not only would be devoid of principle, but also would create an entirely new category of disputes concerning the appointment of arbitrators and the characterization of arbitral panels as domestic, foreign, or international." *Id.* at 191. The court concluded that Congress did not intend such a result.

Shortly after the Second Circuit's decision in *NBC*, the Fifth Circuit in *Biedermann*, relying heavily on the Second Circuit's rationale, rejected efforts to use § 1782 to obtain discovery from a nonparty relating to an arbitration before the Stockholm Chamber of Commerce. *See Biedermann*, 168 F.3d at 883 ("Empowering arbitrators or, worse, the parties, in private international disputes to seek ancillary discovery through the federal courts does not benefit the arbitration process."). The court emphasized that arbitration is a creature of contract, where both the substance and procedure for arbitration may be agreed upon in advance. *Id.*

Thus, allowing resort to § 1782 discovery in arbitrations, where the parties "may prearrange discovery mechanisms directly or by selecting an established forum or body of governing principles in which the conventions of discovery are settled," would thwart the intent that arbitration serve as a "speedy, economical, and effective means of dispute resolution." *Id.*

After *NBC* and *Biederman*, the Supreme Court decided *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). In *Intel*, the Court made clear that when Congress amended § 1782 to include the term "proceeding in a foreign or international tribunal," it understood the amendment to allow for U.S. judicial assistance in connection with "*administrative and quasi-judicial proceedings* abroad." *Intel*, 542 U.S. at 258 (citing S. REP. NO. 88-1580, at 7-8 (1964), *reprinted in* 1964 U.S.C.C.A.N. 3782, 3788) (emphasis added). *See also id.* at 249 ("Congress introduced the word 'tribunal' to ensure that 'assistance is not confined to proceedings before conventional courts,' but extends also to 'administrative and quasi-judicial proceedings.'") (quoting S. REP. NO. 88-1580, at 7-8). The Court never held that international arbitral panels constitute "tribunals" within the meaning of § 1782, and in fact that issue was not before the Court.[10]

After *Intel*, the only Circuit Court of Appeal to address the issue of whether an international arbitral panel is a "tribunal" within the meaning of § 1782 has held that it is not. *See El Paso Corp.*, 341 F. App'x 31 (5th Cir. 2009). The Fifth Circuit in *El Paso Corporation* reaffirmed its earlier holding set forth in *Biedermann*, that an international arbitral tribunal is not a "tribunal" within the meaning of § 1782. *See id.* at 33-34. The court reemphasized the points made in *Biedermann* and *NBC*, *i.e.*, that if § 1782 were to apply to international arbitral tribunals, this would not only create new disputes concerning the characterization of arbitration disputes as

---

[10] Several district court opinions in the wake of *Intel* have interpreted the Supreme Court's opinion to hold that arbitral tribunals are within the ambit of § 1782. Although the Court in *Intel* quoted commentary that included a reference to "arbitral tribunals," this issue was not before the Court.

domestic, foreign or international, but would also destroy arbitration's principal advantage as a quick, less costly and efficient means of dispute resolution. *See id.* at 34.

Subsequent to *Intel*, other district courts have also held that an international arbitral tribunal is not a "tribunal" within the meaning of § 1782. *See In re Application of Operadora DB Mexico, S.A. de C.V.*, 6:09-cv-383-Orl-22GJK, 2009 WL 2423138, at *3-12 (M.D. Fla. Aug. 4, 2009); *In re Arbitration in London, England*, 626 F. Supp. 2d 882, 885-86 (N.D. Ill. 2009).

CIOC appears to argue that an ICSID arbitration is "state-sponsored" (Petition at 14-15), and that therefore an ICSID arbitral panel is a "tribunal" within the meaning of § 1782. However, not a single court has ever held that an ICSID arbitral tribunal is state-sponsored or a "governmental or intergovernmental arbitral tribunal."[11] An ICSID arbitral panel is not a governmental entity such as an administrative or investigative court which acts as a state instrumentality or with the authority of any one or more states. An ICSID arbitration, no different than any other private international arbitration, is neither an "administrative and quasi-judicial proceeding," nor is it state-sponsored. *See La Comision Ejecutiva Hidroelecctrica Del Rio Lempa v. El Paso Corp.*, 617 F. Supp. 2d 481, 485-86 (S.D. Tex. 2008) ("An arbitral tribunal exists as a parallel source of decision-making to, and is entirely separate from, the judiciary...."), *aff'd*, 341 F. App'x 31 (5th Cir. 2009).

As set forth in more detail above (*supra* pp. 4-8), ICSID is an autonomous, independent and self-contained organization unassociated with any particular sovereign state or multi-state body or organ. *See* http://icsid.worldbank.org/ICSID/ICSID/AboutICSID_Home.jsp;

---

[11] CIOC points to an opinion from the District Court of New Jersey for the proposition that Congress meant to include "governmental or intergovernmental arbitral tribunals and conventional courts and other state-sponsored adjudicatory bodies" within the ambit of § 1782 (Petition at 14) (quoting *In the Matter of the Application of Oxus Gold PLC*, Misc. No. 06-82-GEB, 2007 WL 1037387, at *5 (D.N.J. Apr. 2, 2007)). However, that case is inapposite as an ICSID arbitral tribunal is not a "governmental or intergovernmental" tribunal. *See supra* at pp. 4-8.

Delaume, *ICSID Arbitration and the Courts*, at 784; REDFERN, LAW AND PRACTICE OF

INTERNATIONAL COMMERCIAL ARBITRATION, at 57; ICSID COMMENTARY, at 351. *See also*

ICSID Convention, Art. 26 (parties consent to ICSID arbitration to the exclusion of any national

or international court remedy).

      Fundamentally, an ICSID arbitral panel is like any other private arbitral panel.

The authority and power of the arbitral panel derives from the parties' agreement to arbitrate, not

from any particular state or group of states. *See Operadora DB Mexico*, 2009 WL 2423138, at

*10-11 (authority of an international arbitral panel derives from a private agreement between the

parties, not from any government or state). As detailed above, an ICSID arbitral panel is

privately appointed by the parties; the panel does not act with any state or sovereign authority,

nor under the aegis of any governmental or intergovernmental entity. Like any other arbitral

panel, an ICSID arbitral panel has no legal authority to issue compulsory process, to compel the

testimony of witnesses or to enforce its own orders concerning provisional remedies. *See supra*

p. 6.

      The entire premise behind CIOC's Petition for § 1782 discovery is the erroneous

notion that an ICSID arbitral tribunal is "state-sponsored" by virtue of the BIT between the

United States and Kazakhstan. This premise is fundamentally flawed. Under the BIT, CIOC had

a number of options with respect to pursuing its claims. CIOC could have chosen to submit its

dispute (a) to the Republic's courts or administrative tribunals – which do act with the authority

of the state; (b) in accordance with any previously agreed dispute settlement procedures; or (c) to

binding arbitration. (BIT, Art. VI(2).) Pursuant to Article VI(3) of the BIT, CIOC had the

option to choose either an ICSID arbitration or one of three other forms of international

arbitration, including "any other arbitration institution, or in accordance with any other

arbitration rules, as may be mutually agreed between the parties to the dispute." (*Id.*, Art. VI(3).)

CIOC chose to arbitrate pursuant to ICSID. However, under CIOC's rationale, any form of

arbitration chosen by CIOC, whether it be ICC arbitration or AAA arbitration, would necessarily

be deemed "state-sponsored" simply because CIOC chose it under the BIT. This is incorrect.

Regardless of the rules selected or the body administering the arbitration, the authority of an

arbitral tribunal picked by the parties as a result of the national's choice to pursue its option to

arbitrate pursuant to the BIT stems solely from the parties' agreement to arbitrate – not from any

state or government.[12]

As a matter of law, an ICSID arbitral tribunal is not a "foreign or international

tribunal" within the meaning of § 1782. The Petition should be denied for this reason alone.

## POINT III

### ASSUMING ARGUENDO THAT § 1782 APPLIES IN THIS CASE, THE *INTEL* FACTORS PRECLUDE A GRANT OF THE REQUESTED DISCOVERY

Even if the Court assumes that § 1782 applies to an international arbitral tribunal,

the Supreme Court in *Intel* specifically held that a grant of § 1782 discovery, in cases where the

statute does apply, is not mandatory. Rather, the grant or denial of a § 1782 application is

discretionary with the district court, based upon an application of certain enumerated factors.

*See Intel*, 542 U.S. at 247 (Section 1782 "authorizes, but does not require, a federal district court

---

[12] Subsequent to *Intel*, at least two district courts, without any analysis, seem to have assumed that the presence of a bilateral investment treaty somehow "establishes" an arbitral tribunal and, as a result, that the arbitral tribunal is state sponsored and imbued with state authority. *See In re Application of Chevron Corp.*, __ F. Supp. 2d __, No. M-19-111, 2010 WL 1801526, at *6 (S.D.N.Y. May 6, 2010); *In the Matter of the Application of Oxus Gold PLC*, No. 06-82-GEB, 2007 WL 1037387, at *5 (D.N.J. Apr. 2, 2007). This assumption is false. The BITs in both *Chevron* and *Oxus Gold*, as the BIT between the United States and Kazakhstan, contain no more than an offer by the contracting state to arbitrate which, if accepted by the national, thereby creates an agreement to arbitrate. *See* Agreement for the Promotion and Protection of Investments, U.K.-Kyrg., at Art. 8, Dec. 8, 1994, U.K.T.S. 7 (1999); Treaty Concerning the Encouragement and Reciprocal Protection of Investment, U.S.-Ecuador, at Art. VI, Aug. 27, 1993, S. TREATY DOC. NO. 103-15 (1993); Treaty Concerning the Reciprocal Encouragement and Protection of Investment, U.S.-Kaz., at Art. VI, May 19, 1992, S. TREATY DOC. NO. 103-12 (1993). Such BITs allow for nothing more than an agreement to arbitrate by the parties; they do not thereby "establish" or "sponsor" an arbitral body that is imbued with sovereign authority.

to provide judicial assistance to foreign or international tribunals or to 'interested person[s]' in proceedings abroad").

In deciding whether or not to grant § 1782 discovery, the factors a district court must consider are as follows:

(1)    Whether "the person from whom discovery is sought is a participant in the foreign proceeding";

(2)    "[T]he nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;"

(3)    "[W]hether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and

(4)    Whether the request is "unduly intrusive or burdensome."

*Intel*, 542 U.S. at 264-65.

Application of the *Intel* factors to CIOC's Petition makes clear that the discovery requested should be denied.

**A.    The Nature of the ICSID Arbitral Panel And The Character of the ICSID Arbitral Proceeding Militate Against Judicial Assistance In The Form of § 1782 Discovery**

As demonstrated above, an ICSID arbitration is self-contained and autonomous in nature, functioning with complete independence from any national court or legal system. The nature and functioning of an ICSID arbitral panel – to which CIOC fully consented – eschews any form of judicial intervention in the arbitration proceeding. *See* ICSID COMMENTARY, at 351

(ICSID Convention Art. 26 represents the principle "of non-interference with the ICSID

arbitration process once it has been instituted," including interference by courts); ICSID

Convention, Art. 44 (ICSID arbitration proceeding is conducted in accordance with the ICSID

Convention and Rules, with the tribunal alone deciding questions of procedure).

Furthermore, the grant of § 1782 discovery in any international arbitration

unjustifiably intrudes on the arbitral proceeding.  As leading commentators have recognized, the

use of § 1782 in an arbitration proceeding defeats a fundamental underlying premise of the

arbitral process – the arbitral panel's control over discovery in the proceeding pending before it:

> In international arbitration, there is no binding set of rules (such as, for example, the Federal Rules of Civil Procedure that apply in litigation in the US federal courts) that give a party to an arbitration proceeding the *right* to conduct discovery.  None of the major rules governing international arbitration proceedings, such as those of the ICC, the AAA or the LCIA, grants the parties a right to discovery.  Rather, they leave that issue to the discretion of the arbitrators. Thus, unless the parties agree to certain discovery procedures in their arbitration agreement or after a dispute arises, it is for the arbitrators to decide whether to permit discovery and, if so, its scope.

> And that is the problem.  Arbitrators control discovery, and are entitled to make their decisions about the scope of discovery by taking into account the various different factors they deem important, including giving the parties a fair opportunity to present their case and treating them equally.

> Section 1782 threatens to undermine the arbitrators' control of the discovery process by taking the decision concerning that process out of their hands and putting it into the hands of a US court, which inevitably will have little familiarity with the case and may issue an order permitting a disparity of access to evidence, with the effect that the parties to the proceeding will not be treated equally.

> \*\*\*

> Indeed, it would be a weighty argument against a section 1782 application if a party were to have made that

22

> application without having sought the permission of the
> arbitrators or before the panel was constituted. After all,
> this argument might run, the arbitrators are in the best
> position to know whether the material sought has a bearing
> on the proceeding, and if the arbitrators have not authorised
> the section 1782 application, then a court should deny it.

John Fellas, *Using Section 1782 in International Arbitration*, 23(3) ARBITRATION INT'L 379,

401-02 (Kluwer Law International 2007) (emphasis in original) (internal citations omitted). *See*

Martin Illmer & Ben Steinbrück, *U.S. Discovery and Foreign Private Arbitration: The Foreign*

*Lawyer's Perspective*, 25(3) JOURNAL OF INT'L ARBITRATION 329, 341 (Kluwer Law

International 2008) ("With their arbitration agreement the parties have afforded the arbitral

tribunal the power to resolve their dispute, which entails the power to determine the procedure of

the taking of evidence.") (internal citation omitted). *See also id.* at 341-42 ("Furthermore, the

arbitral tribunal retains the control over the process of the taking of evidence and the conduct of

the arbitral process. It is in a far better position to accommodate disparity concerns and the

parties conduct in the arbitral proceedings, in particular attempts to circumvent foreign proof-

gathering restrictions.") (internal citations omitted).

　　　　In holding that § 1782 does not apply to international arbitrations, the Second and

Fifth Circuits have emphasized that granting full-blown, Federal Rules-style discovery from non-

parties through § 1782 – in the face of a party's choice to arbitrate in a forum with far greater

limitations on discovery than anything contemplated by § 1782 – will completely undermine the

independent functioning of the arbitral panel and fundamentally alter the character of its

proceedings, especially with respect to the nature and scope of evidence it permits the parties to

obtain and present. *See NBC*, 165 F.3d at 190-91; *Biedermann*, 168 F.3d at 883.

　　　　A grant of § 1782 discovery in this case will plainly interfere with the ICSID

arbitral panel's running and oversight of discovery in the arbitration, including the limitations

imposed on the parties by the nature of the arbitral rules of the forum which CIOC itself selected, as well as the schedules and limitations on discovery that have already been put in place by the panel and to which the parties have agreed.  In fact, CIOC's request for non-party discovery is in complete derogation of the schedule adopted by the arbitral panel, which specifically provides for the scope and timing of discovery. (Wolrich Decl. ¶¶ 10-11, Ex. C at ¶ 14.)  Pursuant to the panel's schedule, CIOC's Reply Memorial is due on July 16, 2010 – that submission is to contain only allegations and evidence which responds to the Republic's earlier submitted Counter-Memorial or which concerns the documents that had already been requested and produced. (*See id.*, Ex. C at ¶ 14.)

Yet, in large part to accommodate the fishing expedition cast by its Petition, CIOC requested that the panel extend the arbitral proceeding for another six months, at a minimum. (Wolrich Decl. ¶ 16.)  The panel denied that request, refusing to allow CIOC's Petition to interfere with the "maintenance of [the panel's] authority over the arbitral procedure and with the timetable established with the consent of the Parties."  (*Id.*, Ex. F at ¶ 2.6.)

In denying CIOC's request for an extension, the panel made clear its displeasure with the fact that CIOC had filed a § 1782 petition without first seeking the panel's consent. (*See* Wolrich Decl. Ex. F at ¶ 2.6.)  Although the panel declined to interfere in this proceeding by issuing an order that CIOC withdraw the Petition, the panel alerted CIOC that CIOC was operating at its own risk and that the panel will not automatically permit the use of any documents which might be obtained pursuant to its Petition.  (*Id.* at ¶ 2.7.)  The panel has clearly voiced its independence from any sort of judicial assistance from a domestic court, and its chilly receptivity to documents obtained from non-parties outside its purview.

**B.   The Petition Conceals An Attempt To Circumvent
The ICSID Panel's Discovery Procedures**

CIOC's petition is in complete derogation of the procedures which govern the arbitration and which were put in place by the panel to guide discovery.

The ICSID Convention and Arbitration Rules provide that discovery in an ICSID arbitration is limited to production of documents and evidence by the parties themselves, and the panel's visits and inquiries with respect to the site connected to the dispute. *See* ICSID Convention, Art. 43; Arbitration Rule 34(2). The parties may, however, agree to expand the scope of document or evidence production beyond these two categories. *See* ICSID Convention, Art. 43.

In this case, there has never been any agreement between the parties with respect to non-party discovery. And CIOC never made an application for non-party discovery to the panel. However, the panel did agree – upon CIOC's proposal – to be guided by the IBA Rules, which include IBA Rule 3.8.

IBA Rule 3.8 contemplates that a party may request and obtain documents from a person or organization who is not a party to the arbitration directly from that non-party. *See* IBA Rule 3.8. *See also* IBA Working Party, *Commentary on the New IBA Rules of Evidence in International Commercial Arbitration*, BUS. L. INT'L, Issue 2, at 23-24 (January 2000) ("First, a party may *request* a production of documents *from a person or organisation which is not a party to the arbitration*.") (emphasis added). But IBA Rule 3.8 does not contemplate that a party may, on its own, resort to taking independent judicial steps to obtain non-party documents outside of the panel's purview, as CIOC did here. Instead, Rule 3.8 provides, in the event a party is unable to obtain non-party documents from a non-party, that the party may ask *the panel* to take the necessary legal steps to obtain such documents. The panel is then to consider the relevance and

25

materiality of the document requests and then decide whether or not it wishes to proceed with taking legal steps to obtain the documents.

In this case, had the panel been presented with CIOC's request for non-party discovery and then determined that the requests were relevant and material to the issues before it, the panel, assuming § 1782 applies at all, could have filed a petition itself. *See* 28 U.S.C. § 1782 ("The order may be made pursuant to a letter rogatory issued, or a request made, by a foreign or international tribunal...."). CIOC denied the panel its opportunity to do so. Rather than allow the panel to first consider the materiality and relevancy of CIOC's non-party discovery requests as required under IBA Rule 3.8, and then, if the panel deemed it appropriate, make a request for third party discovery, CIOC unilaterally filed its Petition.

It is clear that the availability of non-party discovery to CIOC is governed by IBA Rule 3.8. To the extent that there was any ambiguity concerning this issue, Article 44 of the ICSID Convention mandates that if any question of procedure arises which is not otherwise addressed by the ICSID Convention, ICSID Arbitration Rules or rules agreed to by the parties, then the ICSID arbitral panel is to decide the question. *See* ICSID Convention, Art. 44 ("If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, *the Tribunal shall decide the question.*") (emphasis added). Thus, the provisions of ICSID itself, as well as those of IBA Rule 3.8, required CIOC to first approach the panel with its request for non-party discovery before filing this Petition.

CIOC's Petition is a clear attempt to circumvent not only Article 43 of the ICSID Convention and ICSID Arbitration Rule 34(2), but also the specific procedures adopted by the ICSID panel with respect to non-party discovery. That fact alone is sufficient to warrant a denial of the Petition. *See Aventis Pharma v. Wyeth*, M-19-70, 2009 U.S. Dist. LEXIS 105422, at *2-3

(S.D.N.Y. Nov. 9, 2009) ("Regardless of whether [petitioner] could have gotten the [foreign tribunal] to compel production of the documents now sought, [petitioner's] motion is clearly an attempt to circumvent foreign proof gathering restrictions that were contractually provided for by the parties' in the choice of forum [] clause.  These sophisticated parties freely chose the [] forum with all its requisite procedural rules.").

## C.   CIOC's Requests Are Unduly Intrusive And Burdensome Given Their Lack Of Precision And Over-Breadth

*Intel*'s fourth factor also weighs heavily against CIOC in this case.  CIOC's Petition offers no more than highly speculative justification for its alleged need for intrusive and far-reaching discovery from third parties who obviously have no bearing on the issues pending in the arbitration.

The theory which CIOC offers as the reason it needs discovery in the United States follows this story-line:  President Nazarbayev allegedly was angry with Rakhat Aliyev, his former son-in-law, for opposing an amendment of Kazakhstan's Constitution and for writing a book criticizing him, and therefore decided to strike out at CIOC because its 92% owner, Devincci Hourani, has a brother, Issam Hourani, who happens to be married to Aliyev's sister.  Thus, the underlying basis for the entire Petition is the idea that Kazakhstan's President sought revenge for his former son-in-law's political opposition by commercially harming the interests of the brother-in-law of the sister of his former son-in-law.

Even if the verity of each link in CIOC's attenuated theory is assumed, that story cannot support the breadth of the requests put forward in the Petition.  While CIOC asserts that each of the five non-parties from whom discovery is sought "has done or is doing various acts on behalf of the Republic of Kazakhstan and the Nazarbayev family that directly impact Caratube

and members of the Hourani family" (Petition at 10-11), CIOC provides no tangible support for that proposition other than mere innuendo.

Two of the non-parties, BGR Group and PIC, are alleged by CIOC to be lobbying firms that do work on behalf of Kazakhstan. CIOC makes absolutely no connection between these lobbying firms, CIOC or the Hourani family and its story of revenge.

Likewise, the other non-parties, Alexander Mirtchev and his associated companies, Krull and GlobalOptions, are alleged by CIOC to regularly advise or do business on behalf of Kazakhstan and for the Nazarbayev family. (*See* Petition at 7.) Again, despite many pages outlining the role of these non-parties in working for Kazakhstan, CIOC makes no connection between them and the tale it weaves of international intrigue. CIOC points to a single email to Krull from an unrelated entity, ETG. From this nebulous lone email, CIOC puts Mr. Mirtchev and Krull in the middle of a plot by Kazakhstan to besmirch the Hourani family members.

Upon close reading of the Petition, CIOC essentially posits that if a person or entity ever worked for or lobbied on behalf of Kazakhstan, that person or entity will likely have information relevant to the breach of contract issues before the ICSID panel. No U.S. court would ever accept so expansive a proposition to justify non-party discovery. *See, e.g., Wyoming v. United States Dep't of Agriculture*, 208 F.R.D. 449, 454 (D.D.C. 2002) (granting non-parties' motion to quash subpoena in part because, even though non-parties provided research data, legal advice and recommendations to defendant, requested documentation fell outside the scope of discovery needed for plaintiff to prove its claim that defendant violated the Federal Advisory Committee Act and therefore was irrelevant to plaintiff's claim).

CIOC's document requests in large part are too broad and unspecific to elicit relevant information to substantiate its tale of political revenge. The requests, in large part seeking virtually *any and all* documents concerning the Government of Kazakhstan, its President and various family members, are too generalized and far-reaching to justify the claim that any such information provided by the non-parties will substantiate CIOC's theory as to the "real" reason why the Republic terminated its contract. There is simply no justification for allowing this burdensome intrusion into the relationship between the Republic and these non-parties to the arbitration. *See In re Application of Heraeus Kulzer*, 3:09-MC-08, 2009 U.S. Dist. LEXIS 29771, at *14-15 (N.D. Ind. Apr. 8, 2009) (quashing § 1782 petition since request for all documents related to allegedly misappropriated trade secret was overly broad and included information irrelevant to foreign action). And the breadth of the requests make them particularly objectionable and inappropriate where the foreign proceeding is an arbitration which traditionally has more limited discovery than that available in the United States. *See NBC*, 165 F.3d at 191; *Biedermann*, 168 F.3d at 883; *Operadora DB Mexico*, 2009 WL 2423138, at *4.

Thus, *Intel*'s fourth factor strongly counsels against the grant of § 1782 non-party discovery in this case.

In sum, the only *Intel* factor that supports the Petition is that the subpoenaed parties are not parties to the arbitral proceeding. But that factor alone cannot justify the relief sought. Each of the other *Intel* factors strongly militates against granting CIOC's broad discovery requests. CIOC should not be permitted to disregard and by-pass the arbitral procedures it itself selected, with the limited discovery that all arbitration necessarily presupposes, as well as the specific discovery orders and timetable agreed to by the parties and the arbitral panel. The Petition should be denied.

## CONCLUSION

For all of the foregoing reasons, the Petition for discovery pursuant to 28 U.S.C. §

1782 should be denied.

Dated: Washington, D.C.
      May 28, 2010

                        Respectfully submitted,

                        CURTIS, MALLET-PREVOST,
                        COLT & MOSLE LLP

                    By: _____
                        Joseph D. Pizzurro
                        (D.C. Bar No. 468922)
                    1717 Pennsylvania Avenue, N.W.
                    Washington, D.C. 20006
                    Tel:  (202) 452-7373
                    Fax:  (202) 452-7333

                    *Attorneys for Republic of Kazakhstan*